Filed 6/17/14  P. v. Morales CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Appellant, | E058593 |
| v. | (Super.Ct.No. SWF1205432) |
| SERGIO SOLANO MORALES, | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County.  Michael J. Rushton, Judge.  Reversed with directions.

Paul E. Zellerbach, District Attorney, Ivy B. Fitzpatrick, Deputy District Attorney, for Plaintiff and Appellant.

Matthew A. Siroka, under appointment by the Court of Appeal, for Defendant and Respondent.

Plaintiff and appellant the Riverside County District Attorney's Office (DA's Office) filed a complaint against defendant and respondent, Sergio Solano Morales, charging him with (1) murder (Pen. Code, § 187);[1] (2) gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a)); (3) leaving the scene of a vehicular accident that involved a death or injury (Veh. Code, § 20001, subd. (a)); and (4) driving while his license was suspended (Veh. Code, § 14601.2, subd. (a)). Various enhancements were also alleged. There were two victims of the car crash. The victim who died was Marissa D. (the victim); the second victim, Alberto A., was injured. The victim's sister, Rosario Kuznetsov (Rosario), was a paralegal in the DA's Office.[2] The victim's brother-in-law, Alexander Kuznetsov (DDA Kuznetsov), was a Deputy District Attorney in the DA's Office.

Defendant moved the trial court to recuse the DA's Office or, in the alternative, to recuse the downtown Riverside branch of the DA's Office. The trial court granted the alternative request. The trial court found there was a conflict of interest, but that the conflict was not so severe as to require the entire DA's Office to be recused. The trial court ordered the downtown Riverside branch of the DA's office be recused from the

---

[1] All subsequent statutory references will be to the Penal Code unless otherwise indicated.

[2] We use Rosario Kuznetsov's first name for clarity, due to her husband having the same last name. No disrespect is intended. Rosario, the victim's sister, was employed by the DA's Office at the time of the car crash. During the pendency of this case, Rosario left the employ of the DA's Office.

case, including the supervisor of vehicular homicide cases, Assistant District Attorney Creg G. Datig (Datig).[3]

The People contend the trial court erred by ordering the downtown branch of the DA's Office be recused from defendant's case. The People provide only one argument heading, but appear to have bundled several arguments under the single heading. (Cal. Rules of Court, rule 8.204(a)(1)(B) [separate headings are required].) We have found three separate arguments. First, the People assert the trial court "should have ended [its] analysis" after its findings in relation to the county-wide recusal motion. Second, the People contend the trial court applied an incorrect legal standard when it conducted a cost-benefit analysis. Third, the People contend the trial court incorrectly interpreted a case, *People v. Gamache* (2010) 48 Cal.4th 347.[4] We reverse the order with directions.

## FACTUAL AND PROCEDURAL HISTORY

On September 30, 2012, defendant allegedly drove a vehicle while intoxicated, which resulted in the victim's death and injuries to Alberto A. The collision occurred in Hemet. The DA's Office Southwest branch, in Murrieta, typically handled cases involving crimes occurring in Hemet. Deputy District Attorney Tahan (Tahan), who worked in the Southwest branch, went to the scene of the crash at 4:35 p.m. on

---

[3] District Attorney Zellerbach was the one exception to the recusal order.

[4] The People (1) mention the substantial evidence standard of review in their appellant's opening brief, and (2) in their appellant's reply brief, assert there was a lack of evidence. Therefore, it is possible the People also intended to raise a substantial evidence argument; however, it is unclear given the mixture of arguments and assertions.

3

September 30. Later that day, at 11:00 p.m., while Tahan was at the hospital for an unrelated fatal collision, he saw DDA Kuznetsov leaving the hospital chapel. Tahan suspected the victim from the 4:35 p.m. crash was related to DDA Kuznetsov's wife, since Rosario's maiden name was the same as the victim's last name. DDA Kuznetsov confirmed the victim was Rosario's sister. Tahan "immediately advised [his] chain-of-command—including ADA Creg Datig, CDDA Guy Pittman, and SDDA Sam Kaloustian—of this new information."

Datig worked as an assistant district attorney, supervising the Western Operations division. Datig supervised the attorneys in the downtown Riverside DA's Office. Tahan, who works in Murrieta, normally would not be supervised by Datig. However, as part of a grant program, Tahan was assigned to prosecute DUI-homicide cases in the Southwest region of the county. Datig, due to his expertise in prosecuting vehicular homicide cases, was the director of the grant program. Therefore, Datig supervised Tahan.

Datig knew Rosario and DDA Kuznetsov. Both Rosario and DDA Kuznetsov were within Datig's "chain of command" in the downtown office. However, he was not the direct supervisor of Rosario or DDA Kuznetsov. Datig asserted he had only "a passing relationship with both employees and do[es] not socialize with either one inside or outside of the office."

On October 3, 2012, staff at the DA's Office met to decide whether, and with what crimes, to charge defendant. The people who attended the meeting were "Assistant District Attorney Sean Lafferty (who has responsibility for the Eastern and

4

Southwestern Divisions), Chief Deputy District Attorney Guy Pittman, Chief Deputy District Attorney E. Michael Soccio, Supervising Deputy District Attorney Sam Kaloustian, and Deputy District Attorney David Tahan. ADA Lafferty was the senior member of the office at the staffing and had authority to make the final charging decision." Datig was traveling out of state, so he was not at the meeting.

The Southwest division of the DA's Office filed a complaint against defendant on October 3, 2012, charging him with the various offenses listed *ante*. Rosario and DDA Kuznetsov were "completely 'walled off'" from the prosecution. The records related to defendant's case were only available to Tahan, employees directly involved in the case, and Tahan's "chain of command," i.e., Datig.

On October 4, defendant's trial counsel (Knight) met with Tahan. Knight offered for defendant to serve 16 years, three months in prison, which would be the maximum sentence without the murder charge. Tahan said, "That might work." Datig was informed of the plea offer. Datig rejected the offer. Defendant offered to enter a plea that would result in an 18-year prison sentence. Datig rejected that offer as well because he believed the offer involved defendant pleading to an allegation that was not supported by the evidence.

At some point during the period when defendant's offers were being considered, Tahan informed Knight of the victim's familial relationships with Rosario and DDA Kuznetsov. In February 2013, defendant filed a motion to recuse the entire DA's Office or, in the alternative, to recuse the downtown division of the office, including Datig. The motion was brought on the basis that defendant could not receive a fair trial due to

5

the DA's Office's conflict of interest, i.e., the victim's relatives being employees of the DA's Office.

Defendant asserted the DA's Office was an "interested party" in defendant's case due to two employees "suffer[ing] a tremendous loss." Defendant asserted the DA's Office could not be impartial in its handling of the case due to the personal interests involved. Therefore, defendant asserted there were both real and perceived conflicts of interest. Defendant argued that while the case was being handled by the Southwest division, any plea deals would involve supervisors from the downtown division, which would affect defendant's right to an impartial prosecutor. Defendant asserted the downtown division had been "undoubtedly impacted" by the "enormity" of this case, such that plea offers could not be impartially considered by members of the downtown division.

The People opposed the motion. The People asserted defendant's conflict argument was speculative and not supported by any evidence. The People asserted the affected relatives, Rosario and DDA Kuznetsov, were "walled off" from the case, and the "matter [was] not being handled differently than any other similar criminal matter." In a declaration attached to the opposition, Tahan declared he had "only a passing work relationship with [Rosario and DDA Kuznetsov]; [he did] not socialize with them at or outside work and [he had] not been assigned to the same unit as either one of them."

The Attorney General (AG) also opposed the motion. The AG asserted (1) Rosario and DDA Kuznetsov were "'walled off'" from the case; (2) Tahan declared he would not treat the case differently than any other case; (3) Tahan declared he did not

6

have a close relationship with Rosario and DDA Kuznetsov; and (4) the documents related to the case were stored on a secure server and were only accessible to Tahan, Tahan's paralegal, Tahan's investigator, and the chief and assistant district attorneys. The AG asserted that given these circumstances, defendant could not show a conflict existed or that the case would be handled unfairly.

Defendant replied to the People's and AG's oppositions. Defendant asserted the need to wall off Rosario and DDA Kuznetsov reflected a conflict existed in the case. Thus, defendant asserted he established there was a conflict, and it was the People's burden to show the wall was effective. Defendant argued that the DA's Office had a centralized structure, wherein filing decisions related to the grant program go through the Downtown division of the office.

Defendant also questioned Datig's level of interaction with Rosario and DDA Kuznetsov, because they worked under Datig's supervision. Additionally, defendant questioned Tahan's assertion that he had only passing work relationships with Rosario and DDA Kuznetsov, since Tahan recognized DDA Kuznetsov at the hospital. Defendant asserted the ethical wall blocking only Rosario and DDA Kuznetsov from the case was ineffective given the connections between Rosario, DDA Kuznetsov, Datig, and Tahan.

On March 8, 2013, the trial court held a hearing on defendant's motion. The trial court asked the parties whether they believed an evidentiary hearing was necessary. Defendant asserted evidence needed to be taken. The People contended an evidentiary hearing was not necessary because defendant did not meet his prima facie burden of

7

showing an appearance of a conflict. The trial court found defendant met his prima facie burden. The trial court explained, "[W]hen somebody hears or reads that the person who supervises [DDA] Kuznetsov, his wife, who are closely related to the victim in this case, is also the one with the ultimate decision-making power as to this particular case, I think, at least for purposes of answering this question, there is evidence of a conflict." The trial court ordered a declaration from Datig be submitted, in order to avoid a subpoena being issued for Datig.

Datig provided a declaration; the relevant details of the declaration are included in the facts set forth *ante*. Chief Deputy District Attorney Mike Soccio also submitted a declaration reflecting, among other things, that Rosario was no longer employed by the DA's office.

The court held a second hearing on the motion on March 22, 2013. Defendant argued Datig knew the victim's relatives. Defendant asserted that as the victim's relatives' supervisor, Datig should be recused. The People argued Datig is "an incredible resource," and removing him would harm the prosecution. The People further asserted there was no evidence of an actual conflict because Datig declared he only knew Rosario and DDA Kuznetsov "in passing." The People contended there was no evidence reflecting Datig was conflicted and defendant was only offering speculation.

In support of his argument, defendant cited *People v. Gamache* (2010) 48 Cal.4th 347 (*Gamache*). The trial court said it found *Gamache* to be "highly illustrative." In *Gamache*, the defendant sought recusal of the entire San Bernardino County District

8

Attorney's Office (SBDA's Office) because a typist who had been working in the SBDA's Office for 10 years was a surviving victim of the defendant's crimes, and a relative of one of defendant's victims. (*Id.* at pp. 361-362.) The trial court found the defendant did not establish a conflict rising to a level that would require recusal of the entire SBDA's Office. (*Id.* at p. 363.)

The Supreme Court affirmed the trial court's ruling, concluding the court did not abuse its discretion.[5] (*Gamache*, *supra*, 48 Cal.4th at p. 363.) The Supreme Court set forth a two-part test for recusal motions: (1) is there a conflict, and (2) if there is a conflict, is it severe enough to require recusal. (*Id.* at p. 361.) The Supreme Court agreed with the defendant that the first prong was satisfied. (*Id.* at p. 362.) Therefore, the Supreme Court focused on whether the trial court abused its discretion in determining the conflict did not rise to a level requiring recusal of the entire SBDA's Office. (*Id.* at pp. 361, 363.)

The Supreme Court cited evidence reflecting the SBDA's Office was large with over 500 employees and a "huge geographic spread." The murder occurred in the area where the employee/victim worked—the desert division—and was initially handled by that division. However, approximately one month after charges were filed, the case was reassigned from the Barstow/Desert Office to the San Bernardino/Central Office, 75 miles away. The Supreme Court noted the prosecutor working on the case in the

---

[5] This court did not issue an opinion in the matter because *Gamache* is a death penalty case. (*Gamache*, *supra*, 48 Cal.4th at p. 356.)

9

Central division never met the victim/employee and was part of a career prosecution group that had its own staff, separate from the rest of the Central division.

The Supreme Court concluded the decision to seek the death penalty was not influenced by a conflict of interest because "the decision maker had no personal relationship with [the victim/employee] and based his decision on input from others with no connection to [the victim/employee]." (*Gamache*, *supra*, 48 Cal.4th at p. 363.) The Supreme Court noted the person who made the decision, District Attorney Dennis Kottmeier, "barely knew" the victim/employee—he did not hire her, did not have social contact with her, did not know her by name, and would only have recognized her face in the context of visiting the Barstow/Desert division of SBDA's Office. (*Ibid.*)

A chief deputy who did know the victim/employee "immediately recognized his participation in the case could create a recusal problem, [and] concluded he should have no role in any discretionary decisions." (*Gamache*, *supra*, 48 Cal.4th at p. 364.) The Supreme Court concluded that, based upon the evidence, the trial court could have reasonably concluded "the prompt steps taken to screen off prosecution of this case from those employees who might have any connection to [the victim/employee, made it so] there was no likelihood the conflict would lead to unfair treatment of [the defendant] at trial." (*Id.* at p. 365.) The high court also again cited the size of the SBDA's Office as a factor in the effectiveness of the ethical walls the office created. (*Id.* at pp. 365-366.)

In the instant case, in regard to the first step—whether there is a conflict, i.e., a reasonable possibility of the prosecutor's impartial discretion being affected (*Gamache*,

10

*supra*, 48 Cal.4th at p. 362)—the trial court concluded that, in light of *Gamache*, there was a conflict. The trial court analogized the instant case with *Gamache*. The trial court noted the victim in the instant case was related to two employees in the DA's Office, which was "rational[ly]" similar to the situation of the victim/employee in *Gamache*, whose husband died. (See *Ibid.*) Thus, the trial court concluded defendant satisfied the first prong.

In regard to the second prong, the trial court began with defendant's request to recuse the entire, county-wide, DA's Office. The trial court noted Datig was not present during the meeting when charging decisions were made in the case. Therefore, the trial court found there was not a severe conflict at the filing stage. Next, the trial court considered whether Datig's involvement with the plea offers "irretrievably harmed" the case. The court found the evidence did not support a finding "that the conflict is so severe that the district attorney's office would need to be removed from the case." Thus, the trial court found "although there is a conflict, notwithstanding what has already happened with the case, in the Court's view, the conflict is not so severe as to disqualify the district attorney's office from acting."

The trial court then turned to its "final question"—whether Datig should be recused from the case, leaving Lafferty to supervise the matter. The trial court said its tentative decision was to order Datig be recused. The People argued "the standard is the same, whether it's the whole office or one person." The trial court explained "Datig works in a discrete office," and the victim's relatives are in Datig's office. The trial

11

court noted in *Gamache*, the one chief deputy that had a relationship with the victim/employee recused himself.

The People argued the chief deputy in *Gamache* knew the victim/employee in a more meaningful way than Datig knows Rosario and/or DDA Kuznetsov. The People again cited the evidence reflecting Datig only knew Rosario and DDA Kuznetsov "in passing." Defendant asserted there is no discussion in *Gamache* about the chief deputy knowing the victim/employee well. Defendant argued *Gamache* did not set forth a requirement for a supervisor to know the affected employee "in a meaningful way."

The trial court gave its ruling.[6] The trial court said, "I've made the decision that there is a conflict of interest. I've further made the decision that both the filing decision and the decisions by Mr. Datig to reject the offers of the defense do not bring this case into the category where the conflict is so severe that the district attorney's office must be disqualified.

"I haven't seen anything in the decision-making process that would suggest that either the decision of the filing group or the decision of Mr. Datig were in any way infected or impacted by their association with these other employees; that other than this issue related to Mr. Datig, a very careful effort was made to wall off the rest of the district attorney's office from Mr. Tahan and his prosecution team, and I can understand rationally why it is that Mr. Datig stayed on the case up to that point in time. This is his

---

[6] We quote the ruling given by the trial court, due to the issues raised in this case.

area of expertise. This is what he prosecutes or supervises, in terms of the grant. All of that makes sense to the Court.

"I guess at this point, in looking at *Gamache*, the Court is asking itself, you know, if there is a conflict of interest, which I have found that there is, and if we are requiring that a wall be set up in order to insure the integrity of the prosecution of the case, and that wall is to protect people who are involved with these employees from being involved in the prosecution of the case, it seems like the wall needs to be intact. The final piece of that wall is Mr. Datig.

"When you kind of do a cost benefit analysis on this, keeping Mr. Datig in verses keeping Mr. Datig out, why keep him in when we could easily keep him out and allow the district attorney's office to continue with the prosecution, maintain the integrity of the prosecution. There is nothing that would prevent the defense from taking a run at another offer to somebody other than Mr. Datig at this point in time.

"So, all of those things considered, and in looking at *Gamache*, in the Court's view, the reason that the trial court was sustained in finding that it was appropriate for San Bernardino to keep the case was that the trial court looked at everything that had been done and the complete separation of the Barstow office from the San Bernardino office.

"So, at this point in time, based on the findings that I have already made, I'm going to make the further order that from this point on Mr. Datig is to be added to that group of people that are walled off from the case. [¶] I'm not going to tell the D.A.'s office who has to supervise the prosecution of the case, but it may not be anyone at the

13

Riverside downtown office. [¶] Mr. Zellerbach, I'm not intervening or making any orders as to his particular role in this, as I've discussed thoroughly with [defense counsel].

"In terms of anyone from the Riverside office being involved in this case, in terms of disposition, trial advice, trial direction, any of those roles that a supervisor would typically play, I'm ordering that from this point on, the Riverside office, other than Mr. Zellerbach, will be completely walled off."

## DISCUSSION

The People contend the trial court erred by ordering Datig, along with the entire downtown Riverside branch of the DA's Office, recused from the case. The People raise three arguments: (1) when the trial court applied the correct legal standard, regarding the entire district attorney's office, it found no conflict involving Datig, which "should have ended the court's analysis"; (2) the trial court applied an incorrect legal standard when it conducted the cost-benefit analysis regarding Datig's recusal; and (3) *Gamache* did not create a rule requiring all supervisors of an affected employee to be recused.

We begin with the first issue: Whether the trial court should have "ended [its] analysis" when it found Datig did not have a conflict requiring recusal of the entire DA's Office. It is unclear if the People's argument is focused on the procedural aspect of the ruling or the factual aspect. As a result, we will address both. We begin with the procedural aspect—whether the trial court was procedurally correct in continuing with its analysis.

14

When a trial court's decision concerning a recusal motion is challenged due to an alleged error of law, we apply the abuse of discretion standard of review. (*People v. Superior Court* (*Humberto S.*) (2008) 43 Cal.4th 737, 742, 746 (*Humberto*).) In *Gamache*, our Supreme Court set forth the rule that there is a two-part test when considering prosecutorial recusal motions. The Supreme Court wrote, "'The statute "articulates a two-part test: '(i) is there a conflict of interest?; and (ii) is the conflict so severe as to disqualify the district attorney from acting?'"' [Citation] Where, as here, a defendant seeks to recuse not just an individual prosecutor but also an entire prosecuting office, he must make an 'especially persuasive' showing. [Citation.]" (*Gamache*, *supra*, 48 Cal.4th at p. 361.)

*Gamache* can be understood as setting forth the rule that a more severe conflict is required to recuse all branches of a county's district attorney's office, than is required to recuse a single branch office or a single attorney. This understanding comes from the language in *Gamache* reflecting "'an especially persuasive' showing" is required for the recusal of all branches of an office. The inference to be made is that a lesser showing is needed when seeking to recuse a small segment of a county's district attorney's office.

Accordingly, when the trial court found the conflict was not so severe as to require recusal of the entire district attorney's office, it was proper for the trial court to continue with its analysis to determine if the conflict was severe enough to require only Datig's recusal or the downtown branch's recusal. So, the trial court was procedurally correct to continue in its analysis.

15

We now turn to the factual findings portion of the issue. We again apply the abuse of discretion standard of review. (*Humberto*, *supra*, 43 Cal.4th at p. 746.) An abuse of discretion occurs when a decision is arbitrary or capricious. (*People v. Thomas* (2012) 53 Cal.4th 771, 806.)

When analyzing the conflict for the county-wide recusal, the trial court found Datig's plea offer decisions were not "in any way infected or impacted by [his] association with these other employees." We infer from context that the "other employees" are Rosario and DDA Kuznetsov. However, when the trial court analyzed the "Datig specific" or "branch specific" recusals, the court concluded Datig needed to be recused because (1) he was "involved with these employees," (2) the recusal would "maintain the integrity of the prosecution," and (3) it would allow the plea offers to be considered by a supervisor other than Datig. Thus, the factual findings are problematic. The trial court found Datig's conflict *did not* impact his decision making, and impliedly found the conflict *did* impact his decision making.

While the trial court was correct to continue in its legal analysis after ruling on the county-wide portion of the motion, the factual findings should not have changed so drastically, since the motion focused on a single employee—Datig. For example, if Datig had a personal conflict, it may not be severe enough to recuse all branches across the county, but it may be severe enough to have Datig recused—that result could be proper assuming, without deciding, the evidence supported such an outcome. However, that is not what occurred in this case. In this case the trial court found Datig *was not* impacted by the conflict, and then impliedly found Datig *was* impacted by the conflict.

16

The factual findings are contradictory and cannot be reconciled. It is not logical to conclude Datig was not impacted by the conflict, and then conclude Datig was impacted by the conflict. As a result, we conclude the trial court abused its discretion by making contradictory findings. We will reverse the ruling and direct the trial court to reconsider the motion.

Defendant contends the trial court did not make contradictory findings. Defendant asserts the trial court found Datig's involvement "had *not yet* created unfair proceedings," but that "going forward there *was* a likelihood that there would be unfairness in the proceedings." In the context of this case, defendant's interpretation of the ruling is problematic. There is no evidence reflecting why Datig would suddenly be more impacted by the conflict than he was when he declined the plea offers. Given the evidence, one would expect there to be a single factual finding regarding the impact of the conflict in relation to Datig—either Datig's decision making has been affected by the conflict, or it has not been affected. There is nothing indicating Datig would become more impacted by the conflict in the future than he was when he declined the plea offers. For example, there is not evidence that DDA Kuznetsov was promoted and would now have a closer working relationship with Datig than he did in the past. Therefore, given the record, we are not persuaded by defendant's interpretation of the ruling.

The People have presented two other arguments as to why the trial court's ruling was erroneous. We decline to address the remaining arguments because they are moot, in that we can offer the People no further relief—the trial court must reconsider the

17

motion. (*People v. Rish* (2008) 163 Cal.App.4th 1370, 1380 ["'[A] case becomes moot when a court ruling can have no practical effect or cannot provide the parties with effective relief'"].)

## DISPOSITION

The recusal order is reversed. The trial court is directed to reconsider the motion, receiving further evidence if deemed necessary by the trial court.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

McKINSTER
Acting P. J.

KING
J.